```
                    UNITED STATES DISTRICT COURT
                   CENTRAL DISTRICT OF CALIFORNIA
                         WESTERN DIVISION


JUDITH ALLEN, ET AL.,          ) CASE NO:  2:14-CV-2721-MWF-FFM
                               )
              Plaintiffs,       )              CIVIL
                               )
     vs.                       )       Los Angeles, California
                               )
GIRARDI KEESE, ET AL.,         )       Tuesday, July 21, 2015
                               )       (10:28 a.m. to 11:02 a.m.)
              Defendants.       )
_____)
```

PLAINTIFFS' MOTION TO COMPEL


BEFORE THE HONORABLE FREDERICK F. MUMM,
UNITED STATES MAGISTRATE JUDGE


<u>APPEARANCES</u>:

| | |
|---|---|
| For Plaintiffs: | JEFFREY B. ISAACS, ESQ. |
| | PAIGE SHEN, ESQ. |
| | Isaacs Friedberg & Labaton, LLP |
| | 555 S. Flower Street, Suite 4250 |
| | Los Angeles, CA 90071 |
| | |
| For Defendants: | ROBERT W. FINNERTY, ESQ. |
| | JORDAN E. SCOTT, ESQ. |
| | Girardi Keese |
| | 1126 Wilshire Blvd. |
| | Los Angeles, CA 90017 |
| | |
| Court Reporter: | Recorded; CourtSmart |
| | |
| Deputy Clerk: | James Munoz / Evelyn Synagogue |
| | |
| Transcriber: | Exceptional Reporting Services, Inc. |
| | P.O. Box 18668 |
| | Corpus Christi, TX 78480-8668 |
| | 361 949-2988 |


Proceedings recorded by electronic sound recording;
transcript produced by transcription service.

1    **Los Angeles, California; Tuesday, July 21, 2015; 10:28 a.m.**

2              **(Call to order)**

3         **THE CLERK:**  Calling Item Number 2, CV-14-2721, *Judith*

4    *Allen, et al. versus Girardi Keese, et al.*  Counsel, please

5    state your appearance.

6         **MR. ISAACS:**  Good morning, Your Honor, Jeffrey Isaacs

7    and Paige Shen on behalf of Plaintiffs.

8         **THE COURT:**  Good morning.

9         **MR. FINNERTY:**  Good morning, your Honor, Bob Finnerty

10   and Jordan Scott on behalf of the Defendants.

11        **THE COURT:**  Good morning, please be seated.  All

12   right, first of all, it looks to me as there really -- there --

13   no issues have been raised here that haven't previously been

14   raised and rejected by the Court in connection with why the

15   documents shouldn't be produced.  The Defendants seem to

16   persist in their contention that they don't agree with the

17   Plaintiffs' theory and so, therefore, they don't have to give

18   them any documents.  And that's just not the way discovery

19   works.  The Defendants keep persisting in claiming that there

20   are documents that are subject to an attorney-client privilege,

21   but there's no privilege log, and that's not the way that

22   discovery is supposed to work.  The only issue that I'm having

23   a hard time getting my arms around is what is the problem with

24   -- I think there are two particular attorneys that the

25   Defendants are adamant they're afraid that the sky is going to

3

1    fall if these attorneys see any of these documents, and I'm not

2    exactly sure what the problem is.  Apparently these attorneys

3    previously had represented some of the Plaintiffs in the multi-

4    district litigation, but I'm not sure.  So I'll hear from

5    either Mr. Finnerty or Ms. Scott with respect to why is there a

6    problem with respect to these two lawyers whose names escape me

7    at the moment.  And if you would please take the podium.

8             **MR. FINNERTY:**  Sure, your Honor.  I think the lawyers

9    that the Court is referring to are Gruber and Snyder.

10            **THE COURT:**  All right.

11            **MR. FINNERTY:**  And, your Honor, in taking a look at

12   the motion and the opposition, I think that the initial concern

13   about Gruber and Snyder is they're out there trying to generate

14   more clients.  That's simply the issue.  But I think that the

15   real issue in this case is what is the claim?  The claim is

16   that Girardi Keese took too much in fees and overcharged in

17   costs.  To date, Girardi Keese has provided a accounting of the

18   amounts recovered, the amounts charged in fees, and the amounts

19   charged in costs.  There's no further information that the

20   Plaintiffs need to determine what has happened here.  We know

21   that 40 percent fees were charged off of the global settlement,

22   and we know what the total costs were.  And each of the clients

23   who signed their consents prior to receiving their

24   distributions knew what the fees were and the costs were.  With

25   that knowledge, they easily had the information as to the

4

1    amount of the global settlement.  And the initial retainers

2    that these people signed with Gruber and Snyder provided for a

3    40 percent fee and costs being deducted prior to distribution.

4    They also provided that distribution -- or settlement could be

5    -- or could occur on a global basis and that all of the

6    Plaintiffs would agree to have the funds distributed to the

7    individual Plaintiffs by an allocation process through a

8    special master.  So the information that Plaintiffs continually

9    say that they need and that Girardi hasn't provided has already

10   been provided.  The only information that I think is

11   outstanding is the master settlement agreement which has been

12   discussion with respect to the productive order request.

13        **THE COURT:**  All right, let me hear from Mr. Isaacs.

14   So you've got everything you need, don't need anything more but

15   the settlement agreement?

16        **MR. ISAACS:**  No, your Honor, that's not correct.  But

17   -- and we would vehemently disagree, as we've set forth in our

18   papers and I think as your Honor recognized in the Torrey Pines

19   Bank order and the Justice Panelli JAMS order.

20        But let me address your Honor's question about Snyder

21   and Gruber.  So the law offices of Howard Snyder and Gruber And

22   Gruber had the original relationship with all of the Plaintiffs

23   in this case; in fact, all of the HRT claimants except for

24   maybe two or three.  They're the ones who have the retainer

25   agreement with them.  They remain counsel for all of the HRT

1    claimants, which includes the Plaintiffs, which I believe has

2    been explained to Mr. Baker.  And it's really unclear to say

3    the least as to what the issue is with respect to these

4    attorneys since they continue to be counsel for and have an

5    attorney-client relationship with all of the HRT claimants, as

6    we refer to the whole group, the 140 or so, in the underlying

7    HRT litigation.  They still have ethical duties and they still

8    have fiduciary duties to these clients.  It appears to be

9    Girardi Keese's position that somehow Snyder and Gruber have

10   brought about this case in order to seek revenge, I think is

11   the term that Mr. O'Callahan used in his declarations, or

12   vengeance.  Don't really understand why that's relevant.  I

13   don't believe that's the case.  But in any event, presumably

14   that would be the subject of some kind of motion practice.  But

15   we don't really want to spend a lot of time -- we've already --

16   we think we've already spent too much time on this whole issue

17   with Girardi Keese, so we've repeatedly proposed protective

18   orders to try to deal first with their concerns about the

19   master settlement agreement and, second, with respect to their

20   concerns about Snyder and Gruber seeing documents that they

21   don't want them to see.  So with respect to the master

22   settlement agreement -- and yesterday, in case your Honor -- in

23   case this issue arose today, we filed electronically some of

24   the more recent correspondence relating to the protective order

25   that the parties have had.  And I provided a hard copy to your

6

1    Honor's clerk and I have one for Defendants' counsel as well.

2    But in any event, with respect to the master settlement

3    agreement, that's been resolved with counsel for the HRT

4    Defendants.   And that actually was resolved several months ago.

5    We drafted a proposed protective order, we sent it to

6    Defendants' counsel, and we sent it to HRT -- the HRT

7    Defendants' counsel, Mr. Dougherty (phonetic).   We reviewed it

8    with him and he was fine with it.   So as -- with respect to the

9    proposed protective order, which I think would deal with a lot

10   of their issues, certainly the privacy issues, the -- and the

11   master settlement agreement issues that they continually raise,

12   that's been resolved in the proposed protective order and I

13   think we're now on the fourth iteration that we have sent to

14   Defendants' counsel.

15          So with respect to Snyder, Gruber, as you might

16   recall, my partner, Mr. Friedburg, when he was last here before

17   your Honor, suggested an attorney's eyes only provision for the

18   Torrey Pines Bank record.   And we understand.   We don't --

19   nobody wants their bank records of the client trust account or

20   the operating account to be seen by anybody that doesn't

21   absolutely need to see it.   And your Honor did a masterful job

22   if I must say of drafting a protective order for the parties

23   with respect to the Torrey Pines Bank records.   Before that

24   order had even issued, we had proposed yet another iteration of

25   a proposed protective order to Defendants' counsel which would

1    expressly address their concerns about Snyder, Gruber.  Part of

2    the problem is that they have designated Snyder, Gruber --

3    Snyder and Gruber as witnesses in their Rule 26 disclosures and

4    we've asked them, are you really going to call these people?

5    Because if you are, they would have to have access to some

6    documents since they would need to be prepared, and these are

7    their clients as well.  And it was reaffirmed by Mr. O'Callahan

8    just a couple of weeks ago, absolutely, we consider them

9    witnesses.  And they've actually sought the testimony of their

10   paralegal.  I think it was Gruber And Gruber's paralegal.  So

11   the problem is that they want them as witnesses, and we

12   understand, that's their prerogative.  And they don't want them

13   to see any records.  So what we proposed was -- and I think

14   it's entirely consistent with your Honor's protective order --

15   is to expressly put any Girardi Keese banking records or

16   internal accounting records that may be produced off limits to

17   Snyder, Gruber.  So under no circumstances because we can't

18   imagine why they would need to be shown or have access to those

19   records.  That proposal apparently has been rejected yet again.

20   So we're now on our fourth or fifth iteration of a proposed

21   protective order and we don't have one, we don't have their

22   stipulation to it.  And, furthermore, we've every time asked

23   them, okay, so you propose some language, and we just get back

24   some type of objection or complaint or criticism or vitriol

25   about Snyder and Gruber.  So I think we understand the issue,

1    we're trying to address it, we really don't think it's relevant

2    or significant, but if it's the impediment, then let's get rid

3    of it.  And the best way to do that is through a protective

4    order and we can -- or I think if your Honor sees the

5    correspondence, I think your Honor's protective order in Torrey

6    Pines Bank would address that issue as well.  The only problem

7    is they maintain that these two lawyers and their staff may be

8    witnesses so they must have access to some documentation.  So

9    that's the Snyder, Gruber -- that's as much as we know about

10   their issue with Snyder, Gruber.

11           And the only thing I'll add is that Defendants have

12   been trying to bring Snyder, Gruber into this case from day

13   one.  When they originally -- when we originally filed the

14   complaint, which was after we couldn't get an accounting out of

15   them, they filed a motion to compel arbitration before Justice

16   Panelli; and, as part of that motion, they also asked that the

17   action be dismissed because Snyder and Gruber were necessary

18   parties.  So that was fully briefed before Judge Fitzgerald.

19   It was heard by him and that argument was expressly rejected in

20   the same order that denied their motion to compel arbitration

21   and a finding that Snyder, Gruber made no claims here, Snyder,

22   Gruber are no different than any of the other lawyers who were

23   working on the case, and there really was no basis to pull them

24   into the case as required parties or necessary parties.  So now

25   they seem to be trying to pull them in as witnesses -- and,

1    again, that's their prerogative -- or as some kind of

2    justification or defense which we really don't understand.

3         But putting that aside, as to these claims that we

4    have everything that we want, we clearly don't.  And really, to

5    get to the real problem with these responses to their -- to our

6    request for production, they've effectively said that in those

7    responses we've produced everything except those documents that

8    we haven't produced.  And they won't tell us what they haven't

9    produced and they won't tell us why they're not producing it.

10   And then in their joint stipulation, they said we'll be

11   providing a privilege log within ten days of the filing of the

12   joint stipulation.  That was three weeks ago.  We still have no

13   privilege log, we have no further communications from them, no

14   mention of it in their supplemental memorandum.  So we're

15   without that.  We don't know exactly what is being withheld,

16   except let me say this.  We're dealing with an aggregate

17   settlement here.  And I think as your Honor now is beginning to

18   get a sense of, there's special rules that have to do with

19   aggregate settlements in terms of obtaining informed written

20   consent and all the disclosures and all the records that have

21   to be maintained.  So we know that we do not have and they

22   should have, because they're required to maintain it by law,

23   any of their banking records relating to the distribution and

24   allocation of these funds or any of their internal accounting

25   records that would let us perform our own accounting, because

10

1    the ones that counsel referred to are horribly inaccurate,

2    don't even add up, don't match any of the other documentation.

3    We go from 5.65 percent in estimated costs which, of course,

4    none of the Plaintiffs were told were estimated, down to 4.9

5    percent.  But the cost report we get after we file the lawsuit

6    is 3.3 percent.  And then we start looking through that and

7    there's all these costs that -- with no backup documentation.

8    So we definitely have a need for it.  I would say they're not

9    just relevant, I think they're critical to trying to find out

10   what happened to all this money, who got what, and when did

11   they get it.  But we also know that we're missing internal

12   communications.  They say the 5.65 percent was a good faith

13   estimate.  Okay, again, no mention of that at the -- to any of

14   the Plaintiffs or any of the HRT claimants.  But there must be

15   some internal documentation by which they went through this

16   process.  Haven't seen any of that.  They haven't produced any

17   of that.

18          And then with respect to -- and I'm just giving your

19   -- the Court a couple of examples -- we have the -- really a

20   key piece of this is how did they allocate funds, that

21   aggregate settlement, between these 140 or so claimants?  And

22   they say, well, that was Justice Panelli.  But when we ask for

23   documentation from JAMS, there is nothing and the invoices

24   don't reflect anything more than two or three hearings or

25   meetings that he conducted.  So we would expect that there

1   would be something documenting how they actually went about

2   allocating, what formula they used, what factors they used, how

3   -- correspondence from Justice Panelli saying here's who gets

4   what and the like.  Nothing.  Then we asked for documentation

5   about the directive, the order from Justice Panelli to withhold

6   six percent.  Nothing.  We've produced everything except for

7   what we haven't produced, again.  And we -- well, we haven't

8   produced and we haven't produced it because it's privileged or

9   we haven't -- we've made an objection to it.  But all those

10  objections that your Honor observed at the outset have been

11  addressed by your Honor in the Torrey Pines Bank order.

12  Attorney-client privilege doesn't apply here, work product

13  doesn't apply, privacy rights which we in no way mean to

14  belittle are either the privacy rights of our clients or

15  privacy rights that could be addressed by a protective order.

16  So there's just really no basis for them to continue to refuse

17  to not just provide us with the documents that are responsive,

18  but what we're missing here is in their responses, telling us,

19  okay, if you don't have something, we need to know that, so

20  let's stop fighting about it.  And if you look at the

21  responses, like I say, they're beyond evasive.  They're just

22  meaningless.  And clearly Rule 34 contemplates that if you're

23  going to raise an objection to certain documents, you raise

24  that objection and then you provide a privilege log as to those

25  documents.  As to anything else, we should be told, yes, there

1  are documents or, no, there are no documents.  And if there are

2  documents, they should be produced.

3          **THE COURT:**  So how soon do you need the documents?

4          **MR. ISAACS:**  This has been dragging on.  And I know

5  from our last -- our telephonic hearing before Judge Fitzgerald

6  that he's growing a little impatient so -- on the other hand, I

7  understand that it's -- takes some time.  We would like them as

8  soon as possible.  I think a reasonable amount of time would be

9  two weeks.  And, again, we have met and conferred and we are

10  always available to meet and confer about specific issues and

11  work through specific issues.  But we have an ethics expert and

12  we have a forensic accountant ready, standing by, waiting,

13  anxious to actually have something to look at so they can get

14  to work on this case.  We have motions that we would like to

15  bring.  They may have motions they may want to bring.  So we

16  would like to try to advance the case.  As your Honor knows,

17  we're not going to be deposing Justice Panelli until late

18  August, and the date we got for the JAMS PMK (phonetic) just

19  yesterday was going to be early September.  So that part of the

20  case is kind of on hold until we're able to conduct those

21  depositions.  So we'd like to get the documents and move on.

22          One last thing.  I just mentioned just to let your

23  Honor know, one bit of good news is that pursuant to your

24  Honor's directive, the parties have agreed on a third party

25  neutral to review the Torrey Pines Bank records, and that's

13

1    going to be retired Superior Court Judge Michael Solner.  And

2    Judge Solner is now beginning his conflicts review and so

3    hopefully he'll be able to start the process with the Torrey

4    Pines Bank records within the next few days.

5              **THE COURT:**  All right.

6              **MR. ISAACS:**  Thank you, your Honor.

7              **THE COURT:**  Anything further you'd like to --

8              **MR. FINNERTY:**  Thanks, your Honor.

9              **THE COURT:**  -- bring to my attention?

10             **MR. FINNERTY:**  Yes, if I could.  Your Honor, if we

11   take a look at the introduction to this motion, it says the

12   basis for the claims.  Defendants paid themselves a 40 percent

13   contingent fee.  We've produced documents to Ms. Allen and all

14   of the Plaintiffs in this case indicating that we charged them

15   a 40 percent fee.  They signed those in order to receive their

16   allocations in the case.

17             The next theory of recovery is that we paid ourselves

18   substantially more than 40 percent of the fee.  Well, if we

19   take a look at Tab 5 -- I'm sorry, Tab 7 of the moving papers,

20   Exhibit 6, we have presented the defendant -- or the

21   Plaintiffs, I'm sorry, with a breakdown of all of the

22   allocations to the individual Plaintiffs, all the fees charged

23   to those individual Plaintiffs, all the costs charged to those

24   individual Plaintiffs with net recoveries then for each

25   Plaintiff in the case, as well as --

14

1          THE COURT:  All right, so which document are you

2    referring to here?

3          MR. FINNERTY:  Tab 7, Exhibit 6, to Jim O'Callahan's

4    declaration.

5          THE COURT:  Okay, and you've also provided all of the

6    backup for all of these figures?

7          MR. FINNERTY:  We have also provided the cost

8    breakdown --

9          THE COURT:  Well, but do you have all the backup to

10   these figures here on this Exhibit 6?

11         MR. FINNERTY:  All of the backup being the consents

12   for each one of these?

13         THE COURT:  No, whatever --

14         MR. FINNERTY:  Each one --

15         THE COURT:  -- evidence you have that would support

16   this figure.  For instance, if we look at the top person,

17   Judith Allen, there are certain figures there.  You must have

18   some documentation that supports those figures.  Has that been

19   produced?

20         MR. FINNERTY:  If you take a look at --

21         THE COURT:  Just answer my question.

22         MR. FINNERTY:  Yes.

23         THE COURT:  Has it been produced?

24         MR. FINNERTY:  Yes, your Honor.

25         THE COURT:  All right.

1          **MR. FINNERTY:**  And if you take a look at Tab 5, so

2     this is exhibit to John Sheehan's (phonetic) declaration, which

3     is Tab 5 --

4          **(Mr. Finnerty/co-counsel confer)**

5          **MR. FINNERTY:**  I'm getting a correction here.  It's

6     Exhibit 5 to Mr. O'Callahan's declaration.  It's Exhibit N.

7     Let's try that one more time.  It's Exhibit N to Mr. Sheehan's

8     declaration.

9          **THE COURT:**  All right.

10         **MR. FINNERTY:**  And it has the July 25th, 2014,

11    Girardi Keese letter to Judith Allen with a copy of her consent

12    attached to it, which is the next page.  It's page 60 in this

13    exhibit, and it spells out that Girardi Keese took 40 percent,

14    it spells out the total cost -- it gives the total amount of

15    attorneys' fees Girardi Keese paid to itself, as well as the

16    total cost that Girardi Keese paid to itself.  Exhibit O has --

17    I'm sorry, Exhibit P has the Girardi Keese cost breakdown for

18    the entire HRT case.  So then the only claim left for the basis

19    of recovery or theory of recovery in this case is that we

20    enjoyed free use of the settlement funds.  That issue is going

21    to be shown to not be accurate with respect to the banking

22    records, your Honor.  So, I mean, there's no basis for any of

23    the theories of recovery that for which we have not already

24    provided all of the evidence they need.  The Court asked

25    Plaintiffs' counsel if they had all of the evidence they need.

16

1    Counsel's response was we don't have all the evidence we want.

2    He didn't address the Court's question about need.  So I think

3    that if we are truly looking at an efficient way of handling

4    litigation, they have everything they need.  There hasn't been

5    a request for further information with respect to these claims

6    that they claim are the basis for their theories of recovery.

7            **THE COURT:**  All right.

8            **MR. ISAACS:**  Your Honor, may I be heard?

9            **THE COURT:**  Yes, please.

10           **MR. ISAACS:**  So if I use the word "want" instead of

11   "need" or "essential," let me please correct the record.  We

12   need these records.  They are -- and documents -- and they

13   actually are essential.

14           **THE COURT:**  Well, and you might keep in mind that the

15   standard isn't need or want, it's whether it's relevant to a

16   claim or defense.

17           **MR. ISAACS:**  Of course, your Honor.  But just so the

18   record is clear, as to this July 25th letter, this of course is

19   a letter that was sent after this litigation began, after

20   Girardi Keese previously sent a letter, Mr. O'Callahan, who's a

21   signatory on the July 25th, 2014, letter, saying, here's your

22   final payment.  Nothing about estimates of cost, which were

23   5.65 percent, nothing about withholding of six percent.  This

24   letter comes only after we filed our lawsuit, only after Judge

25   Fitzgerald denied their motion to compel arbitration before

17

1    Justice Panelli.  But more importantly, when it comes to what's

2    our claim, this information is largely false.  Forty percent?

3    They're not entitled to 40 percent.  They had no retainer

4    agreement.  Judge Fitzgerald has already found that.  The

5    retainer agreement was between Ms. Allen and the other HRT

6    claimants and the Snyder and Gruber firms.  Now they're down to

7    4.9 percent of costs which are about 850,000.  Previously they

8    were at I think it was about 980,000 in costs.  But then, if

9    you look at the costs report that counsel referenced, that only

10   adds up to about 540,000, I think.  So we have this huge gap.

11   And most of those entries turn out to be unsubstantiated, or

12   certainly raise issues of grossly excessive payments, or

13   payments that just don't seem to even have been made.  And

14   that's exactly why we need the banking records and the

15   accounting records.

16          And lastly, we're not dealing with a commercial case

17   here with parties who are at arm's length.  Girardi Keese were

18   the counsel.  They had an attorney-client relationship with all

19   these HRT claimants.  They owed them ethical duties, they owed

20   them fiduciary duties of full disclosure, not to mislead, to

21   maintain certain records, to make full -- to make certain

22   disclosures, and that clearly didn't happen.  So I think we

23   have a very strong basis for our claims already.  And what

24   we're trying to do is just get the evidence that will allow us

25   to determine how serious it is, the extent of the

1    misappropriations, the extent of the non-payments, and the

2    extent of the misstatements, misrepresentations, and non-

3    disclosures.  And, as your Honor has observed, that's all

4    relevant and that's the way litigation works.  So we're

5    certainly not here trying to waste anybody's time, impose undue

6    burdens on Defendants.  We have a need for these documents,

7    they're clearly relevant.  And we're happy to further engage in

8    any discussions about the underlying merits of the case.  I

9    think as your Honor observed at the outset, they may disagree,

10   but I think we've made our case and we were very careful in our

11   papers, in the joint stipulation, for each category to document

12   why the request was relevant.  And they've never come back to

13   us and said, oh, it's way too broad or it's -- we don't

14   understand it or vague or anything.  As I said, all they said

15   was we produced everything except that what we're not going to

16   produce because we think it's privileged or we have another

17   objection.  And your Honor has already addressed that, and I

18   think our papers do.

19        **THE COURT:**  Let me ask you this.  Is there -- are

20   there any other motions on the horizon here?  How is discovery

21   going in general?

22        **MR. ISAACS:**  Discovery is not going well.  There are

23   a number of other motions on the horizon.  To be honest with

24   you, Girardi Keese seems to have just sort of decided not to

25   participate in the discovery process.  The last two sets of

19

1    interrogatories and our -- and a follow-up set of request for

2    production were never responded to.  Time has gone, we are now

3    in the process of writing meet and confer letters on those.

4    And then I think we will be filing a motion to compel responses

5    -- further responses on our first set of interrogatories

6    limiting it just to those where we -- where documents may not

7    be enough.  So I think it's fair to say everybody abhors these

8    types of discovery motions.  We're doing everything we can to

9    avoid it.  We've engaged in extensive meet and confers,

10   multiple in person, exchange of correspondence and the like,

11   and we can't even -- we don't even have a stipulation to a

12   protective order which I've never had a problem with that in a

13   case.  And frankly, if we're not able to resolve it or if

14   they're not willing to accept our latest proposal or some

15   modification of your Honor's Torrey Pines Bank protective

16   order, then we're -- and we've actually been working on an ex

17   parte application to bring that issue before your Honor so we

18   can get a protective order in place and at least beyond that.

19          **THE COURT:**  All right.  Well, let me do a couple of

20   things here.  First, I'm going to grant the motion in full, all

21   the objections are overruled.  The Defendants are ordered to

22   produce supplemental responses without objections to all the

23   document requests and to produce all the documents within two

24   weeks.  Secondly, I want the Plaintiffs to submit to the Court

25   a proposed protective order; and then within five days

1    thereafter, Defendants may file objections that specifically

2    address the language they object to and propose alternate

3    language.  And then I will enter a protective order.  And then

4    thirdly, I think that we've had enough (indiscernible) matters

5    on discovery here, so I'm going to try to do something to see

6    if I can't perhaps encourage the parties to cooperate a little

7    more.  And the first step is going to be that I would ask the

8    Plaintiffs to provide a declaration of all the fees you've

9    incurred in connection with this motion.  The Defendants can,

10   within five days thereafter, object to any particular fees and

11   make statements as to why they don't think I should order fees

12   because I think you're entitled to notice before I would award

13   fees.  And once I then issue an award regarding the fees, if we

14   get another motion, I will look at it but I must admit that it

15   seems to me almost every single issue involved in this motion I

16   previously ruled upon on other motions.  I don't want to rule

17   upon the same issue again.  And if I do, then what I'll do is I

18   will ask for declarations regarding attorneys' fees incurred in

19   the prior motions, and so we can add those up.  We can get to a

20   point perhaps where it will be considered, I don't know, should

21   we say appropriate for counsel to deal with each other and work

22   with discovery and get the information to the Plaintiffs that

23   they want or that they need.  But certainly whether they want

24   it or need it, if it's relevant to a claim or defense, they're

25   entitled to it and they're going to have it.  And this case has

21

1    been dragging on and the discovery shouldn't be dragging on.

2    So that's going to be my ruling.  So how soon can you get me

3    that protective order?

4            **MR. ISAACS:**  Probably by tomorrow.

5            **THE COURT:**  All right, that'll be fine.

6            **MR. ISAACS:**  Is that soon enough?

7            **THE COURT:**  Then you'll have five days to file

8    objections to the protective order.  And you can also, you

9    know, provide alternate language if you have some other

10   proposal.  Is there anything further?

11           **MR. ISAACS:**  I believe that's it, your Honor, thank

12   you very much.

13           **THE COURT:**  All right.

14           **MR. FINNERTY:**  Thank you, your Honor.

15           **THE COURT:**  Thank you.

16           **THE CLERK:**  All rise.  This Court is now adjourned.

17           **(This proceeding was adjourned at 11:02 a.m.)**

18

19

20

21

22

23

24

25

CERTIFICATION

I certify that the foregoing is a correct transcript from the electronic sound recording of the proceedings in the above-entitled matter.

_____        _July 27, 2015_

                    TONI HUDSON, TRANSCRIBER